## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| APM RESTAURANT GROUP, INC., | ) | |
| AN ILLINOIS CORPORATION, | ) | |
| AND JOSLIN ALFAR, | ) | |
| | ) | NO. 16 C 2495 |
| PLAINTIFFS, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | SIDNEY I. SCHENKIER |
| | ) | |
| ASSOCIATED BANK, A WISCONSIN | ) | |
| BANKING CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiffs, APM Restaurant Group, Inc. ("APM") and Joslin Alfar ("Ms. Alfar") (collectively "plaintiffs"), have sued defendant Associated Bank ("Associated") in connection with 15 checks drawn on APM's account that Associated negotiated. APM asserts claims against Associated for breach of the Illinois Uniform Commercial Code ("UCC") for unlawfully charging APM's bank account for allegedly forged checks that were not properly payable, conversion in cashing forged and unauthorized checks from APM's bank account, and estoppel (doc. # 15: Am. Compl., Counts I-II and IV). Ms. Alfar asserts a separate claim against Associated for negligence (*Id.*, Count III). Defendant has asserted various affirmative defenses to plaintiffs' claims (doc. # 20: Answer at 9-13). Following discovery, defendant filed a motion for summary judgment (doc. # 61). The motion is fully briefed. For the reasons set forth below, we grant defendant's motion.

---

[1] On December 20, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings (doc. # 33).

In support of its motion for summary judgment, defendant submitted a statement of material facts (doc. # 62: DSOF). Plaintiffs responded to defendant's statement of material facts (doc. # 66: Pl.s' Resp. to DSOF), filed a declaration of Peter Sayegh (doc. # 65: Sayegh Dec.), and filed a Rule 56.1(b)(c)(3) statement of additional facts (doc. # 67: PSOF). Defendant moved to strike (doc. # 74) plaintiffs' statement of additional facts (doc. # 67) which we granted (doc. #78) and to strike Mr. Sayegh's declaration (doc. # 76) which we denied (doc. # 78). The following facts are undisputed unless otherwise indicated.

In early 2014, APM was formed and then acquired and began operating a restaurant known as Niko's Lodge ("Niko's") located in Algonquin, Illinois (DSOF, ¶ 6). Ms. Alfar was the sole owner of APM (DSOF, ¶ 7) but was not involved in the day-to-day operation of Niko's and never reviewed APM's financial records (DSOF, ¶ 30; doc. # 62-4: Alfar Dep. 7:9-15).[2] Ms. Alfar was not employed from 2013 to the present, she did not know if she filed a federal tax return for 2014 or 2015, and she was not sure if she had ever filed a tax return (DSOF, ¶¶ 31, 32). Ms. Alfar did not know what her income was in 2014 or 2015 and she also did not know how much she was paid by APM in 2014 or 2015 (DSOF, ¶¶ 33, 34).

Ms. Alfar's husband, Peter Sayegh, was the general manager of APM and responsible for the operation of its business (DSOF, ¶ 9). Deanna Marcanti worked as a manager of Niko's (DSOF, ¶ 10).

On October 31, 2014, APM opened a checking account at Associated and became a customer of the bank (DSOF, ¶ 8). A Deposit Account Agreement governed the banking relationship between APM and Associated (DSOF, ¶ 11). Mr. Sayegh signed the document

---

[2] While plaintiffs purport to dispute these facts, the evidentiary material Associated cited supports the asserted facts. Thus, there is no genuine dispute about these facts.

acknowledging receipt of the Deposit Account Agreement on behalf of APM as its secretary (doc. # 61-3 at 114). APM requested and received online banking services with Associated, and APM (through Mr. Sayegh) reviewed its online statements and checks monthly (DSOF, ¶ 12). Mr. Sayegh was an authorized signer of APM's accounts at Associated (doc. # 61-3 at 114).

Deanna Marcanti was a manager at Niko's (DSOF, ¶ 10). APM kept its checks in a safe at Niko's to which Ms. Marcanti had access as a manager (DSOF, ¶ 13). APM never took steps to prevent Ms. Marcanti from having access to checks for APM's account with Associated, because part of her job description was to pay vendors (DSOF, ¶¶ 14, 15). APM also gave Ms. Marcanti its Associated online banking username and password so that she could access and use APM's accounts online (DSOF, ¶ 16). At various times, Ms. Marcanti participated with Mr. Sayegh on phone calls with Associated to discuss APM's accounts (DSOF, ¶ 17).

APM alleges that Ms. Marcanti first forged and cashed a check drawn on the Associated account dated January 20, 2015 (doc. # 61-3 at 180). APM allegedly first learned that Ms. Marcanti had forged checks "sometime early in 2015," but Mr. Sayegh could not be more specific as to the date (DSOF, ¶ 20). APM did not report to the police that Ms. Marcanti had stolen, forged and cashed any checks until May 5, 2015, almost five months after Ms. Marcanti allegedly first forged and cashed a check (DSOF, ¶ 19). Furthermore, APM did not submit an Affidavit of Forged Endorsement/Forged Maker ("APM Affidavit") to Associated Bank until May 12, 2015 even though the affidavit attests that 15 of its checks were stolen, forged, and negotiated by its manager between January 20, 2015 and April 27, 2015 (DSOF, ¶¶ 21, 22). APM also did not file a claim with its insurer for the alleged theft of its checks by Ms. Marcanti (DSOF, ¶ 27). APM was informed on June 15, 2015 that its claim of alleged fraud on its account was denied by Associated (doc. # 61-3 at 195).

Plaintiffs allege that on February 11, 2015 Mr. Sayegh placed an alert on APM's bank account on the basis that there was an unaccounted withdrawal and a bank balance discrepancy (doc. # 15: Am. Cmplt., ¶ 10; doc. # 20: Answer, ¶ 10). However, there is no evidence that in making that request, Mr. Sayegh identified Ms. Marcanti as a person making "unaccounted" withdrawals or informed Associated it should not cash checks she presented.

APM's Affidavit submitted in May 2015 attests that the following 15 checks totaling $82,657.36 were stolen, forged, and negotiated by Ms. Marcanti:

| Check Number | Date | Payable to | Amount |
|---|---|---|---|
| 1001 | 1/20/2015 | Cash | $6,792.10 |
| 1001 | 1/23/2015 | Cash | $3,900.00 |
| 1001 | 2/6/2015 | Cash | $8,815.56 |
| 1001 | 2/17/2015 | Cash | $10,000.00 |
| 2006 | 3/10/2015 | Cash | $3,800.00 |
| 2009 | 3/16/2015 | Cash | $4,201.00 |
| 2010 | 3/16/2015 | Cash | $4,000.00 |
| 2011 | 3/17/2015 | Cash | $2,500.00 |
| 2014 | 3/23/2015 | Restaurant Depot | $4,712.89 |
| 2016 | 3/23/2015 | Cash | $4,500.00 |
| 2017 | 3/24/2015 | Cash | $1,500.00 |
| 2018 | 3/27/2015 | Restaurant Depot | $5,435.81 |
| 2019 | 3/30/2015 | Cash | $2,500.00 |
| 2007 | 4/27/2015 | Deanna Marcanti | $10,000.00 |
| 2008 | 4/27/2015 | Deanna Marcanti | $10,000.00 |
| | | | |
| | | **Total:** | **$82,657.36** |

(DSOF, ¶ 22; doc. 61-3 at 180-82).

Removing the two $10,000.00 checks payable to Ms. Marcanti, which we will discuss later, leaves a potential balance of $62,657.36 in allegedly forged checks. However, Mr. Sayegh testified that check numbers 2014 and 2018, totaling $10,148.70 and payable to Restaurant Depot, were used to purchase supplies for Niko's (doc. # 61-3 at 40, 42, 191, 192). Thus, this reduces the balance to $52,508.66 in alleged forged checks.

The remaining eleven allegedly forged checks all were made payable to "cash"; however, each check contained a notation on the memo line indicating how the funds were to be used, such as for payment to various vendors, payroll, or "cash for store." Gordon Food Service ("GFS"), Costco, Mickey Linens, and Wirtz Beverage were all vendors of Niko's during the relevant time (doc. # 61-3 at 16, 36) and APM received an invoice from the Kane County Health Department for services (doc. # 61-3 at 35). James McGovern, a forensic accountant and certified public accountant for 31 years retained by Associated for this case, prepared an expert report and testified as to the flow of fluids for these 11 checks made payable to cash (doc. # 62-5). The chart below sets forth Mr. McGovern's analysis (to which plaintiffs have offered no rebuttal) as to how the cash from the allegedly forged checks was used (doc. # 62-5 at 37):

| | Allegedly Forged Checks | | | | | Subsequent distribution of checks payable to Cash | | |
|---|---|---|---|---|---|---|---|---|
| **Date** | **Amount** | **Number** | **Drawn by** | **Payable to** | | **Cashier's Check** | **Cash** | **To the Order of** |
| | | | | | | | | |
| 1/20/2015 | $6,792.10 | 1001 | APM | Cash | | $3.500.00 | | GFS |
| | | | | | | $3,292.10 | | Costco |
| | | | | | | $6,792.10 | | |
| | | | | | | | | |
| 1/23/2015 | $3,900.00 | 1001 | APM | Cash | | $3,206.00 | | GFS |
| | | | | | | $694.00 | | Kane Cty. Health Dept. |
| | | | | | | $3,900.00 | | |
| | | | | | | | | |
| 2/6/2015 | $8,815.56 | 1001 | APM | Cash | | $4,000.00 | | GFS |
| | | | | | | $1,815.56 | | Mickeys Linens |
| | | | | | | | $3,000.00 | Payroll |
| | | | | | | $5,815.56 | $3,000.00 | |
| | | | | | | | | |
| 2/17/2015 | $10,000.00 | 1001 | APM | Cash | | $5,000.00 | | GFS |
| | | | | | | $3,500.00 | | Wirtz Beverage |
| | | | | | | | $1,500.00 | Cash for Store |
| | | | | | | $8,500.00 | $1,500.00 | |
| | | | | | | | | |
| 3/10/2015 | $3,800.00 | 2006 | APM | Cash | | $2,100.00 | | Wirtz Beverage |
| | | | | | | | $1,700.00 | Cash for Store |
| | | | | | | $2,100.00 | $1,700.00 | |
| | | | | | | | | |
| 3/16/2015 | $4,201.00 | 2009 | APM | Cash | | $4,201.00 | | GFS |
| | | | | | | | | |
| 3/16/2015 | $4,000.00 | 2010 | APM | Cash | | | $4,000.00 | Cash for Store |
| | | | | | | | | |
| 3/17/2015 | $2,500.00 | 2011 | APM | Cash | | | $2,500.00 | Cash for Store |
| | | | | | | | | |
| 3/23/2015 | $4,500.00 | 2016 | APM | Cash | | | $4,500.00 | Cash for Store |
| | | | | | | | | |
| 3/24/2015 | $1,500.00 | 2017 | APM | Cash | | | $1,500.00 | Cash for Store |
| | | | | | | | | |
| 3/30/2015 | $2,500.00 | 2019 | APM | Cash | | | $2,500.00 | Cash for Store |
| | | | | | | | | |
| **Total** | **$52,508.66** | | | | | **$31,308.66** | **$21,200.00** | |

The check dated January 23, 2015 for $3,900.00 and the check dated February 6, 2015 for $8,815.56 were both signed by Mr. Sayegh (DSOF, ¶¶ 25, 26). Additionally, Mr. Sayegh admitted that the proceeds of these cashed checks were used to purchase the cashier's checks to pay the vendors identified in the chart above (doc. # 61-3 at 35, 36). Mr. Sayegh also testified that the proceeds of the cashed checks dated January 20, 2015 in the amount of $6,792.10, February 17, 2015 in the amount of $10,000.00, and March 10, 2015 in the amount of $3,800.00 were used to purchase the cashier's checks to pay the vendors identified in the chart above (doc. # 61-3 at 35, 36-37, 39). Thus, the balance of alleged forged checks (the proceeds of which were used for corporate purposes) is further reduced by $31,308.66 to $21,200.00.

Mr. Sayegh testified that depending on the day of the week, he kept one thousand to three thousand dollars in cash at Niko's (doc. # 61-3 at 37). Additionally, he did not offer any evidence to refute that the cash obtained by the checks negotiated on March 16, 17, 23, 24 and 30, 2015 was used for anything other than the store as indicated on the checks. Rather, Mr. Sayegh testified that during the pendency of the suit, he had no access to APM's ledgers, as they either were left at Niko's when the restaurant closed or were lost (doc. # 61-3 at 8, doc. # 62-8: APM's Answers to Associated's Request for Production ¶ 6.) Mr. Sayegh nonetheless testified that he knew the checks dated March 10, 16, 17, 23, 24, and 30 were all forged on or about the date of each check, but did not notify Associated of the alleged forgery at the time these checks were cashed (doc. # 61-3 at 43-44). This was so despite the fact that Mr. Sayegh reviewed all of APM's monthly bank statements, which were available to him no later than seven days after the end date on each statement (doc. # 61-3 at 19, 20 (January), 36 (February), 38 (March), 45 (April)).

The two checks dated April 27, 2015 each made payable to Ms. Marcanti in the amount of $10,000.00 were signed by Mr. Sayegh (DSOF, ¶ 24; doc. # 65: Sayegh Dec. ¶ 3; doc. # 61-3 at

44, 193, 194). Mr. Sayegh testified that he wrote "repayment for personal loan" on each check after Ms. Marcanti discussed with him that she personally paid bills for Niko's and wanted to be reimbursed for her loan; Mr. Sayegh filled in all the information on the checks, other than Ms. Marcanti's name and the date, and then placed the two signed checks into the safe at Niko's, to which Ms. Marcanti had access (doc. # 61-3 at 44). Plaintiffs testified that Ms. Marcanti thereafter retrieved the checks from the safe, filled in her name and the date and cashed the two $10,000 checks at Associated (doc. # 61-3 at 32, 44). In exchange for the checks, plaintiffs alleged that Ms. Marcanti received $6,000 in cash and $14,000 in a cashier's check that she cashed the following day at Associated (doc. # 61-3 at 32-33). Upon learning that the two $10,000 checks were cashed, plaintiffs allege Mr. Sayegh contacted Associated and requested a stop payment on the $14,000 cashier's check to which he was told that could not be done because Ms. Marcanti was the remitter (*Id.*).

Associated's expert witness, Mr. McGovern, testified that APM suffered a net loss of $223,977.00 during its operations in 2014 and 2015, Ms. Alfar only received $9,000.00 in income from APM in 2014 per APM's tax return, and Ms. Alfar suffered a loss of $214,977.00 (doc. # 62-5 at 6-7, 35). Mr. McGovern further testified that APM's claim that the value of the business lost was $2,050,000.00 did not comply with generally accepted valuation standards, was highly speculative and was unsupported by the documentation plaintiffs produced (doc. # 62-5 at 2, 34-35). Plaintiffs point to no evidence to refute Mr. McGovern's testimony.

## II.

Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, we "must view the facts and make all reasonable inferences that favor them in the light most favorable to the party opposing summary judgment." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). "[T]he nonmovant must go beyond the pleadings ... to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (internal quotations and citations omitted).

A court can deny summary judgment if the facts (as opposed to mere conclusions) asserted by the opposing party are supported by evidence and create a genuine dispute of material fact. *See Johnson*, 892 F.3d at 901. That standard does not change even if the only evidence submitted on a fact is the "self-serving" testimony of the opposing parties in affidavits or depositions. *Id.*; *see also Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014). "[A] district court may consider any evidence that would be admissible at trial. The evidence need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (internal citations omitted); *see also* Fed. R. Civ. P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

That said, we must be mindful that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Moreover, mere speculation or conjecture is insufficient to defeat a summary judgment motion. *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) (internal citations omitted). Likewise, a "mere scintilla of evidence" is also insufficient—on its own—to prove a genuine issue of material fact. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citing *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir.2009)). As the Seventh Circuit has admonished, summary judgment is a "put up or shut up" time in the litigation, *Johnson v. Cambridge Indus., Inc.*, 325 F. 3d 892, 901 (7th Cir. 2003), when a party opposing summary judgment must "wheel out all its artillery" to show that there is a viable case that should proceed to trial. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

In this case, subject matter jurisdiction in federal court is premised on diversity jurisdiction as APM is an Illinois corporation, Ms. Alfar is an Illinois citizen, and Associated is a Wisconsin banking association (DSOF, ¶¶ 1-3). Therefore, we apply the substantive law of the forum state, Illinois. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 876 (7th Cir. 2005).

## III.

In Count I, APM alleges that Associated violated the UCC by unlawfully charging APM's bank account for forged checks that were not properly payable pursuant to 810 ILCS 5/4-401, and for cashing the forged and unauthorized checks (doc. # 15, ¶¶ 16-20). Section 4-401 states in relevant part:

§ 4-401. When bank may charge customer's account.

(a) A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.

*   *   *

(d) A bank that in good faith makes payment to a holder may charge the indicated account of its customer according to:

> (1) the original terms of the altered item; or
> (2) the terms of the completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper.

810 ILCS 5/4-401. Associated was entitled to charge APM's accounts for the checks that were authorized and in accordance with the Deposit Account Agreement (doc. # 61-3 at 115-179) pursuant to §4-401. Section 4-401 also contains a safe harbor provision, which provides that even if the subject checks were not authorized by APM, no violation of the statute occurred if the bank acted in good faith. 810 ILCS 5/4-401(d), cmt. 4.

APM's claim that Associated violated the Section 5/4-401 fails for the following reasons: (a) APM offered no evidence from which a reasonable fact finder could conclude that Ms. Marcanti lacked authority to present checks; (b) APM offered no evidence that Associated was on notice that Ms. Marcanti lacked authority; (c) APM failed to comply with the Deposit Account Agreement; (d) APM offered no evidence to contradict Mr. McGovern's tracking of the money of the checks at issue and Associated had no authority to claw back the $14,000.00 cashier's check.

A.

APM offered no evidence from which a reasonable fact finder could conclude that Ms. Marcanti lacked authority to present checks to Associated. Rather, APM admitted that it held Ms. Marcanti out as an employee of APM with authority to present checks to Associated. Ms. Marcanti,

as a manager at Niko's, had access to the checks for APM's account with Associated that were kept in the safe at Niko's (DSOF, ¶ 10, 13). APM never took steps to prevent Ms. Marcanti from having access to these checks, because part of her job description was to pay vendors (DSOF, ¶¶ 14, 15). APM also gave Ms. Marcanti its Associated online banking username and password so that she could access and use APM's accounts online (DSOF, ¶ 16). At various times, Ms. Marcanti participated with Mr. Sayegh on phone calls with Associated to discuss APM's accounts (DSOF, ¶ 17).

**B.**

APM asserts that Associated was on notice Ms. Marcanti lacked authority to cash checks because APM placed an "alert" on its account on February 11, 2015 (doc. # 68: Pl.'s Opp. at 2). We disagree. The alert did not identify Ms. Marcanti as the culprit, and so did not place Associated on notice to beware of cashing checks she presented. And, this general "alert" was not a cure for APM's failure to provide the specific notice required by the Deposit Account Agreement. Had APM complied with that agreement and timely reported the alleged forged check to Associated, Associated could have prevented additional checks from being cashed and protected APM's deposited funds. Instead, APM waited months to report the alleged forgery to Associated thus setting up a pattern and practice of Ms. Marcanti being known by Associated to have authority to cash large checks on behalf of APM.

**C.**

The relationship between the bank and its depositor is contractual in nature." *Continental Cas. Co., Inc. v. American National Bank and Trust Co. of Chicago*, 329 Ill.App.3d 686, 692, 768 N.E.2d 352, 357 (1st Dist. 2002). A deposit agreement creates a binding contract between a bank

and its depositor. *Id.* APM's failure to comply with the terms of that agreement are fatal to its claim in Count I.

*First*, according to sections 8.3.1 and 8.3.2 of the Deposit Account Agreement between APM and Associated, APM was obligated to notify Associated *immediately* of any lost or stolen checks or of any unauthorized use of APM's account (DSOF, ¶ 11; doc. # 61-3 at 19, 114, and 148). APM further agreed to cooperate in the investigation of any claimed loss, by among other things, timely providing Associated with an affidavit that contained statements that would enable Associated to investigate facts and to pursue legal prosecution, and to prevent or recover any loss. (*Id.*). APM failed to provide any evidence that it timely complied with the notice requirements of the Deposit Account Agreement. Moreover, despite first learning that Ms. Marcanti had allegedly stolen, forged and cashed APM's checks sometime in early 2015, APM did not immediately notify Associated; rather, APM waited several months, until May 12, 2015, to submit the required affidavit to Associated (doc. # 61-3 at 22, 30, 180-83).

*Second*, Sections 8.2.1 and 8.2.2 of the Deposit Account Agreement required APM to examine its account statements and report any unauthorized signatures, alterations, other unauthorized transactions or errors to Associated within 14 days from when the statement was first sent or made available to APM (doc. # 61-3 at 147-48). If APM failed to report any of these issues within the 14-day time period, then APM is contractually barred from asserting a claim against Associated, and the loss would be entirely APM's (*Id.* at 148). It is undisputed that APM reviewed its online statements and checks monthly (DSOF, ¶ 12), and that it first learned that Ms. Marcanti allegedly had forged checks "sometime early in 2015" (DSOF, ¶ 20). Yet APM did not report to Associated that APM's checks were stolen, forged and cashed until it submitted APM's Affidavit on May 12, 2015, which was well outside the 14-day time period (doc. # 62: DSOF, ¶¶ 21, 22).

Thus, by the terms of the Deposit Account Agreement, the loss is entirely APM's responsibility. *See also* 810 ILCS 5/4-406.[3]

**D.**

APM alleges that 15 checks, totaling $82,657.36, were forged or unauthorized (doc. #15: Am. Cmplt.). However, the undisputed evidence fails to create a triable issue on APM's claim that Ms. Marcanti was not authorized to present the checks to Associated or that the proceeds were improperly diverted to Ms. Marcanti.

As discussed and detailed in the charts above, Mr. Sayegh, APM's corporate representative, testified and admitted that: (1) checks 2014 and 2018, totaling $10,148.70 and made payable to Restaurant Depot, were used to purchase supplies for Niko's (doc. # 61-3 at 40, 42, 191, 192); (2) checks 1001 (dated 1/23/15 for $3,900) and 1001 (dated 2/6/15 for $8,815.56) were signed by Mr. Sayegh, APM's authorized signatory, and the proceeds were used to pay APM vendors (doc. # 62, ¶¶ 25, 26, doc. # 61-3 at 35, 36); (3) $39,793.00 of the proceeds for the remaining checks payable to "cash" were used to pay various vendors, payroll, or cash for the store (checks 1001 dated 1/20/15 for $6,792.10, 1001 dated 2/17/15 for $10,000.00, 2006 dated 3/10/15 for $3,800.00, 2009 dated 3/16/15 for $4,201.00, 2010 dated 3/16/15 for $4,000.00, 2011 dated 3/17/15 for $2,500.00, 2016 dated 3/23/15 for $4,500.00, 2017 dated 3/24/15 for $1,500.00, 2019 dated 3/30/15 for $2,500.00) (doc. # 61-3 at 16, 35, 36, 37, 39).

---

[3] We note that the 14-day limitation is without regard to whether Associated used ordinary care (doc. # 61-3 at 148). And the undisputed facts show APM failed to use ordinary care in safeguarding its checks and supervising its employee, Ms. Marcanti. After it first suspected that Ms. Marcanti allegedly was forging checks sometime in early 2015, APM continued to give her unfettered access to checks, including pre-signed checks, housed in Niko's safe. APM also continued to give Ms. Marcanti its Associated online banking username and password so that Ms. Marcanti could use APM's accounts online, and, Ms. Marcanti participated with Mr. Sayegh on phone calls with Associated representatives to discuss APM's bank accounts (doc. # 61-3 at 60).

Moreover, the undisputed facts show that the remaining $21,200.00 for the checks payable to cash were kept for use at the store. Mr. Sayegh testified that depending on the day of the week, he kept one thousand to three thousand dollars in cash at Niko's (doc. # 61-3 at 37). APM did not offer any evidence to show that the cash was used for anything other than the store as indicated on the checks, and APM has no evidence to refute this as Mr. Sayegh testified APM's ledgers were either lost or left at Niko's when the restaurant closed (doc. # 61-3 at 8, doc. # 62-8, ¶ 6). While APM argues that where checks were payable to "cash" only the endorser, Mr. Sayegh, could receive the money (doc. # 68 at 11), APM failed to cite to any evidence or authority to support that proposition or, more importantly, that prior to April 27, 2015 APM put Associated on notice of that alleged limitation on Ms. Marcanti's authority. Unsupported assertions of fact are insufficient to create a *genuine* dispute of material fact.

That leaves for discussion only the two APM checks payable to Ms. Marcanti dated April 27, 2015. The undisputed facts belie plaintiffs' claim that these checks were forged. To begin with, both checks were signed by Mr. Sayegh (doc. # 62 ¶ 24; doc. # 65: Sayegh Dec. ¶ 3; doc. # 61-3 at 44, 193, 194). Mr. Sayegh testified that he wrote "repayment for personal loan" on each check after Ms. Marcanti discussed with him that she personally paid bills for Niko's and wanted to be reimbursed for her loan; Mr. Sayegh filled in all the information on the checks, including the amount, other than Ms. Marcanti's name and the date and then placed the two signed checks into the safe at Niko's to which Ms. Marcanti had free access (doc. # 61-3 at 44).

Mr. Sayegh testified that Ms. Marcanti retrieved the checks from the safe, filled in her name and the date and cashed the two $10,000.00 checks at Associated (doc. # 61-3 at 32, 44). In exchange for the checks, APM alleged that Ms. Marcanti received $6,000.00 in cash and $14,000.00 in a cashier's check that she cashed the following day (doc. # 61-3 at 32-33). Upon

learning that the two $10,000.00 checks were cashed, Mr. Sayegh contacted Associated and requested the cancellation of the $14,000.00 cashier's check (*Id.*). However, it is well settled in Illinois "that a bank may not stop payment on a cashier's check." *Real Estate Auctions, Inc. v. Nat'l Republic Bank of Chicago*, No. 90 C 4174, 1991 WL 268659 *2 (N.D. Ill. Dec. 3, 1991). APM relies on Section 6.4 of the Deposit Account Agreement to support its argument that Associated could stop payment on a cashier's check once issued (doc. # 68 at 11). However, Section 6.4 only applies to a purchaser, remitter or payee of an Associated cashier's check that is lost, stolen or destroyed (doc. # 61-3 at 142). Here, Ms. Marcanti was the purchaser, remitter, and payee of the $14,000.00 cashier's check, not APM; therefore, under the agreement, Associated had no authority to cancel the cashier's check.

In sum, plaintiffs have not presented evidence to create a triable issue on whether Ms. Marcanti was authorized to present the checks, whether Associated was put on notice that she was not, whether the funds from those checks were diverted, or whether APM failed to provide the notice required by the Deposit Account Agreement. Therefore, summary judgment is granted to Associated on Count I.

### IV.

In Count II of its amended complaint, APM asserts a claim for conversion of an instrument and states that Associated cashed forged and unauthorized checks from APM's account in violation of 810 ILCS 5/3-420(a) (doc. # 15 at 5-6). Summary judgment is granted to Associated on Count II for the same reasons it was granted as to Count I; APM has failed to create a triable issue on whether the checks Associated cashed were forged or unauthorized.

In addition, Section 3-420 states in relevant part that "[a]n action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or

indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." 810 ILCS 5/3-420(a). The plain language of the statute precludes the *issuer*[4] (here, APM) of an instrument from bringing an action for conversion against Associated. 810 ILCS 5/3-420; *see also Young Soo Kim v. TD Ameritrade, Inc.*, 891 F.Supp.2d 936, 940 (N.D. Ill. 2012) (holding "[b]ecause plaintiffs were the issuers of the checks, they cannot, according to the plain language of the statute, bring an action for conversion under § 3-420"). According to the official comment, the reasoning behind disallowing a claim for conversion by the drawer of a check is that "[t]he check represents an obligation of the drawer rather than the property of the drawer." 810 ILCS 5/3-402 cmt. 1. "The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check." *Id.* Under Section 3-420, APM as the drawer has no viable claim against Associated for conversion. Therefore, summary judgment is granted to Associated on Count II.

## V.

Ms. Alfar's only claim against Associated is Count III which alleges common law negligence. Ms. Alfar claims that Associated had a duty to exercise due care to not wrongfully report derogatory information about guarantors and signatories on the APM account to credit reporting agencies and banking agencies; that Associated breached that duty by wrongfully reporting derogatory information about Ms. Alfar to such agencies; and that Ms. Alfar was injured by being deprived an opportunity to generate annual income of $250,000, obtain loans, and have a livelihood (doc. # 15: Am. Compl, ¶¶ 27-31). We grant summary judgment in Associated's favor on Ms. Alfar's claim for several reasons.

---

[4] Issuer is defined by the UCC as "applies to issued and unissued instruments and means a maker or drawer of an instrument." 810 ILCS 5/3-105.

*First*, Ms. Alfar did not respond to Associated's argument in favor of entering summary judgment on this count in the Response brief (doc. # 68). The silence resulting from Ms. Alfar's failure to respond to the argument is deafening. That silence leads us to conclude that Ms. Alfar concedes that summary judgment is appropriate on the negligence count. She has therefore waived or abandoned her negligence count by failing to adequately develop arguments relating to it. *Ericson v. Stolfe*, No. 17 C 1434, 2018 WL 4355202 *8 (N.D. Ill. Sept. 12, 2018) citing *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (holding that the plaintiffs had waived claims where they did not respond to defendant's arguments and "did not provide the district court with any basis to decide" them); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver"); *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motors Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("A party's failure to meaningfully respond to a motion for summary judgment ... constitutes waiver"); *see also Huang v. Continental Cas. Co.*, 2012 WL 104628, at *6 (N.D. Ill. Jan. 12, 2012) ("A party abandons a claim by failing to address it in his response brief to a motion for summary judgment") (citing *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003)).

*Second*, even apart from waiver, the summary judgment record shows no evidence from which a reasonable jury could conclude that Associated owed Ms. Alfar a duty. Whether a duty exists is a question of law determined by the court. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018). To determine if a duty exists, courts consider the following factors: "(1) the foreseeability of the injury; (2) the likelihood of the injury; (3) the difficulty of guarding against it; and (4) the consequences of putting the burden to guard against it on the defendant." *Id.* There is no evidence to show that Ms. Alfar was a guarantor on APM's checking account. Likewise,

there is no evidence to back up the naked assertion that Associated "wrongfully reporting derogatory information" (or, indeed *any* information) about Ms. Alfar that resulted in damages.

Finally, summary judgment is also granted because Ms. Alfar's negligence count is trying to recover, in tort solely for economic losses, which is prohibited by the *Moorman* doctrine. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 91-92, 435 N.E.2d 443, 453 (1982). Illinois bars negligence claims when the alleged loss is solely economic. *Id.* at 450-51; *See also Glob. Cash Network, Inc. v. Worldpay, US, Inc.*, 148 F. Supp. 3d 716, 722-23 (N.D. Ill. 2015) (holding negligence claim dismissed where no nonmonetary loss was adequately alleged). Similarly, here, Ms. Alfar only seeks a monetary loss; she offers no evidence of any noneconomic loss that would allow her to escape from application of the *Moorman* doctrine. To the extent Ms. Alfar was seeking a nonmonetary loss, she has provided no evidence that Associated reported or provided representations or information of any kind to anyone about her.

## VI.

In Count IV of the amended complaint, titled "Collateral Estoppel – Detrimental Reliance APM against the Bank," (doc. # 15: Am. Compl. at 7) APM claims that, to its financial detriment, APM relied on Associated's promise to make good on the checks cashed by Ms. Marcanti. Collateral estoppel, however, is an equitable doctrine that precludes a party from re-litigating an issue decided in a prior proceeding. *Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999). As no evidence of a prior adjudication of the matter at hand was alleged by APM, there can be no basis for application of collateral estoppel.

Detrimental reliance is an element of the cause of action of promissory estoppel and in some instances is used interchangeably with promissory estoppel. *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990). Therefore, despite the label of Count IV, it may

be that APM seeks to pursue a claim for promissory estoppel. If so, that claim fails as well; APM runs into a brick wall because the doctrine of promissory estoppel is an equitable tool that allows a court to infer a contract where none otherwise exists. *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). Here, the parties were bound by a written contract, namely the Deposit Account Agreement, that governed the banking relationship between APM and Associated and detailed what APM was required to do if it had checks stolen, suspected fraud, or believed there was unauthorized activity on the account (doc. # 61-3 at 114, 115-179).

Even if the claim did not fail for the above stated reasons, it would fall flat because APM failed to provide any evidence of detrimental reliance. Mr. Sayegh testified that APM ceased operating Niko's and closed the end of April, beginning of May 2015 (doc. # 61-3 at 38), a couple of weeks prior to APM submitting APM's Affidavit of alleged forgeries to Associated on May 12, 2015 (doc. # 61-3 at 180-183). The restaurant was therefore closed for approximately two weeks before APM's Affidavit was submitted to the bank. APM further admitted that it received the June 15, 2015 letter that AnnMarie Dombrowski (Associated's Customer Care Senior Specialist) sent on behalf of Associated to APM informing APM that the bank exhausted its investigation and denied APM's claim (doc. # 61-3 at 46, 195). And it is undisputed that APM did not file a claim with its insurer for the alleged theft of its checks by Ms. Marcanti (DSOF, ¶ 27).

APM failed to support its claim in Count IV, whether that be for collateral estoppel or promissory estoppel. Summary judgment is granted in favor of Associated on Count IV.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety (doc. # 61). We enter judgment for defendant and against plaintiffs on all claims. This case is terminated.

In light of the Executive Committee's Order of June 11, 2019 barring plaintiffs' attorney, Mr. Salem, from practicing in this Court and barring him from seeking reinstatement until at least June 11, 2020 (doc. # 90), we order that Mr. Salem deliver a copy of this Memorandum Opinion and Order to his clients, APM and Ms. Alfar, and that Mr. Salem certify to this Court in writing, by July 17, 2019 that he has done so.

If the plaintiffs wish to appeal, they must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). We note that APM, as a corporation, cannot file a notice of appeal on a *pro se* (without an attorney) basis. If APM wishes to appeal, an attorney other than Mr. Salem will need to represent APM. Ms. Alfar, as an individual, has the right to file a notice of appeal *pro se*.

Plaintiffs need not bring a motion to reconsider this Court's ruling to preserve their appellate rights. However, if plaintiffs wish the Court to reconsider its judgment, they may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b); again, while Ms. Alfar has the right to do so *pro se*, APM may only do so through counsel. Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment

or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:  July 10, 2019**